UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
\* \* \* \* \*\* \* \* \* \*\* \* \* \* \*\* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA,

                vs.                                      5:06-CR-448-001

AARON M. SHEFLER; VANCE
HALL; and CARL CRUMP a/k/a/
"Bubba,"

                     Defendants.
\*\* \* \* \* \*\* \* \* \* \* \*\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**APPEARANCES:**

Andrew T. Baxter, Esq.                       Richard R. Southwick, Esq.
Acting United States Attorney for the        Assistant U.S. Attorney
 Northern District of New York
100 South Clinton Street
Syracuse, New York 13261-7198

Gary B. Zimmerman, Esq.
100 Ross Street - Suite 304
Pittsburgh, PA 15219
*Attorney for Defendant Shefler*

**Norman A. Mordue, Chief U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

      Defendant Aaron Shefler moves for suppression of evidence seized by law enforcement officers after a stop of a vehicle in which he and co-defendant Hall were traveling as passengers in Potsdam, New York. Defendant Shefler submits that the initial stop of the van for a speeding violation was unlawful since unindicted co-conspirator Craig Barber, the operator of the van, was not speeding and the law enforcement officer who initiated the stop had no scientific basis to believe otherwise. Defendant contends that the officer's determination that Barber had violated the traffic law was simply a "subterfuge" to justify stopping the vehicle to search for drugs based

on information given to police by a confidential informant.  Based upon the initial unlawful traffic stop, defendant Shefler argues that the subsequent sniff and search of the van by a K-9 unit was also illegal.  Alternatively, Shefler contends that even if the K-9 sniff and search was legal, the dog was unreliable since he alerted to the presence of drugs when none were found.

## II.    FACTUAL BACKGROUND

The facts of the present motion as adduced at an evidentiary hearing in this matter are as follows:  On April 6, 2006, the St. Lawrence County Narcotics Task Force received information from a confidential informant that Craig Barber was going to be delivering a load of marijuana from Snye, Quebec - located on the Akwesasne Reservation - to his residence in Nicholville, New York.  Detective Sergeant William Carlisle of the Task Force contacted the Village of Potsdam Police Department and told Potsdam Police Officer Scott Thompson that the Task Force might need assistance with surveilling the van, a K9 unit or a traffic stop.  The Task Force set up surveillance on Barber's residence and observed a white rented minivan parked in the driveway.  At approximately 6:00 p.m., the van was observed heading west on State Route 11B toward Potsdam.  Detective Carlisle testified that he called Officer Thompson and told him that the white minivan was headed his way.  Carlisle then followed the vehicle to the Village of Potsdam and handed off surveillance to another Task Force officer.  During the time he surveilled the vehicle, Carlisle did not observe the driver violate any traffic laws.

Mark LaBrake testified that he took over surveilling the white minivan where Carlisle left off.  In April 2006, LaBrake was employed as an officer with the Village of Massena Police Department and was also assigned to the St. Lawrence County Drug Task Force.  Officer LaBrake was 7 to 10 car lengths behind the white minivan when he observed the vehicle make a "right on

red" at the intersection of Market and Maple Streets where "right on red" turns were prohibited expressly by a large black and white metal sign hanging next to the traffic light. When Officer LaBrake observed the traffic infraction, he broadcast the information over his police radio.

After talking to Detective Carlisle, Officer Thompson had set up a stationary surveillance point on Maple Street (Route 11) close to the Eben's Hearth Restaurant on the western edge of the Village of Potsdam. Carlisle had advised Thompson that if he saw the operator of the van violate the New York State Traffic Law, he should initiate a stop. Officer Thompson was able to hear communications from Carlisle and LaBrake over his police radio. At one point, Thompson heard LaBrake say that the white minivan had passed through a red light. Officer Thompson then observed the minivan approaching him traveling south from Potsdam toward the Village of Canton. The posted speed limit in that area of the Village of Potsdam is 30 mph. Thompson estimated the white minivan was traveling at approximately 40 mph. Thompson's radar equipment confirmed the excessive speed of 41 mph.

Just past Thompson's surveillance point, the minivan approached a bridge over railroad tracks on Route 11 which demarcated the Village of Potsdam limits. As indicated by a posted traffic control sign, the speed zone changed at the bridge from 30 mph to 55 mph. After the white van passed Thompson, he initiated a traffic stop by activating his lights. Thompson stopped the vehicle on the other side of the aforementioned bridge and learned that the vehicle was being operated by Craig Barber. Barber advised Thompson that he had a learners permit but did not have it in his possession. Thompson also asked Barber for the vehicle registration, Barber said the van was rented but he did not know by whom. Barber said he was going to the Best Western in Canton, about 10 miles away. Thompson then asked Barber to step out of and to the rear of the

3

vehicle.  Thompson asked another officer who had pulled in to assist in the stop to observe Barber while Barber's license information was retrieved[1] and Thompson attempted to obtain further information about the vehicle from the two passengers.

Thompson then approached the front passenger side of the minivan and spoke to defendant Aaron Shefler.  Thompson asked Shefler if he could retrieve documentation concerning rental of the vehicle from the glove box.  Thompson observed Shefler reach into the vehicle glove box but he was unable to find the requested documents.  When asked by Thompson where the group was headed, Shefler replied "home," to Pennsylvania.  The backseat passenger, defendant Hall, also indicated that they had been heading to Pennsylvania at the time of the stop which Thompson found suspicious given Barber's statement that the group was staying at a motel in Canton.  Thompson asked the two passengers to exit the vehicle so he could investigate further and they agreed.

Thompson knew the Task Force had requested his assistance in a narcotics investigation and that the services of his K9 might be needed.  He then retrieved his dog, K9 Drake, from his patrol car.  Thompson then ran the dog around the perimeter of the vehicle.  The first time around the van, K9 Drake rose up and alerted to the open driver's side window and attempted to gain access to the vehicle.  The second time around the vehicle, the K9 reacted the same way. Thompson then allowed the dog to go inside the van for a further investigation.  Moments later, the dog began digging at a duffel bag or backpack in the rear of the vehicle.  Thompson then retrieved K9 Drake and advised another officer on the scene of the bag upon which the dog had

---

[1] Thompson later learned that Barber's license had been suspended.

4

alerted.  Upon inspection, law enforcement officers located $200,000.00 in U.S. currency inside the bag.  No drugs were found inside the van.

Task Force officers then transported the three men for questioning and processing on New York State drug charges.  During transport of defendant Hall to the St. Lawrence County Sheriff's Department, Hall told one officer that the van also contained firearms.  Officers searched and located two 9 mm pistols in the other black backpack in the van.  The guns were owned by Hall and Shefler who were licensed to carry them in Pennsylvania.  Later, a fourth member of the group, Matthew Roszner, was taken into custody at a nearby hotel room where he was found with $100,000.00 in U.S. currency and a pistol.  Thompson issued three tickets to Craig Barber on the date of the stop - "speed in zone, unlicensed driver and disobey[ing] the right on red."  The "right on red" ticket was issued based on the observations of Officer LaBrake who saw Barber make an illegal turn at the intersection of Market and [Maple] Streets.

Defendant Shefler submits that the initial stop of the van was unlawful since the van was not speeding and Officer Thompson had no scientific basis to believe otherwise.  Indeed, Shefler contends that the speed limit sign **visible to motorists** in the area of Eben's Hearth Restaurant is 55 mph. Moreover, Shefler contends that Thompson's determination that the vehicle was speeding was a mere guess.  Shefler argues that it is apparent from review of police reports provided in the course of discovery that the police were going to stop the white van in question one way or another given the information received from a confidential informant and that the officer's determination that the van had violated the traffic law was simply a "subterfuge" to justify stopping the vehicle to search for drugs.

Defendant Shefler also argues that he was illegally detained and questioned by Officer

5

Thompson out of the presence of the other occupants of the vehicle.  Shefler avers that since the van was not stopped lawfully the sniff and search of the van by the K-9 unit was illegal.  Moreover, Shefler contends that even if the K-9 sniff and search was legal, the dog was unreliable since he alerted to the presence of drugs when none were found.  Finally, while Shefler averred in an affidavit in support of the suppression motion that K9 Drake dog **did not** alert to the presence of drugs while outside the van, he testified at the hearing in this case that the dog did alert, but that was likely due to the fact that he had Craig Barber's small white dog on his lap at the time of the stop.  For his part, Thompson denied seeing a dog in defendants' vehicle and stated that if a dog had been present he would have seen it.

### III.    DISCUSSION

Defendant Shefler argues that Officer Thompson had no grounds upon which to stop the vehicle since there was no traffic violation.  Specifically he contends that there is a 55 mph speed limit sign visible to motorists in the area of the restaurant where the van was stopped and that therefore Barber was not speeding as alleged by Thompson.  The government asserts that the speed limit change outside the Village of Potsdam from 30 mph to 55 mph did not authorize Barber to drive 55 mph until he reached the latter sign on Route 11.  Shefler also contends that he has standing to contest both the stop and search of the vehicle.  To wit, according to Shefler, since Thompson had no reasonable suspicion to stop the vehicle, he was not authorized to question its occupants or order his dog to sniff search the outside of the van.

It is clear from established case law that while a passenger in a vehicle has the right to make a Fourth Amendment challenge to a stop of the vehicle, he generally has no standing to challenge a search of the vehicle unless he can establish a specific expectation of privacy.  *See,*

*e.g., Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978); *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988), *cert. denied*, 490 U.S. 1052 (1989).  Making the required showing of an expectation of privacy in the vehicle would be especially difficult in this case given the rental status of the van. However, since an automobile stop may result in a Fourth Amendment "seizure" of a car and the passengers alike, a passenger may have standing to challenge the **seizure** of the vehicle even if he or she lacks standing to challenge a search.  *See United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995); *United States v. Muyet*, 946 F.Supp. 302,  304-05 (S.D.N.Y. 1996); *United States v. Clark*, 822 F.Supp. 990, 1004 (W.D.N.Y. 1993).  Indeed, if the initial stop of the vehicle was illegal - that is, not supported by probable cause or a reasonable suspicion of unlawful conduct - evidence seized in a subsequent search may well be excludable as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994).

However, while defendant Shefler's contention concerning his standing to contest the initial stop of the vehicle may be correct, his argument that the Task Force's use of a traffic violation as a subterfuge for stopping the van thereby invalidates the ensuing narcotics search is misplaced.  In *Scopo*, *supra*, the Second Circuit adopted the "authorization" test for determining the validity of a vehicle stop and the resultant seizure of evidence. Under this test, a court must focus on whether the particular law enforcement officer " 'in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." ' *Scopo*, 19 F.3d at 184 (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)).  If there was probable cause, the stop is justified, "and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." *Id*.  A valid basis

for a stop and search is not "rendered invalid by the fact that police resort[ed] to a pretext for one purpose or another to continue that [stop] and search." *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir.), *cert. denied*, 484 U.S. 957 (1987).

"[A]n ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Accordingly, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Here, Thompson's stop was based upon a specific and articulable fact: the observed traffic violation of speeding. Though defendant Shefler denied that Barber was speeding prior to the stop, his testimony failed to raise a question concerning the credible evidence presented by Officer Thompson. Thompson averred that he believed the vehicle was speeding when he first observed it and that his observation was confirmed by his standard police radar equipment. The court finds no reason to doubt Officer Thompson's testimony concerning these facts.

As to defendant's argument that Barber was not speeding in the 30 mph zone because the 55 mph sign was visible as they approached the village limits, it is clear from legal authority submitted by the government, including New York State Vehicle and Traffic Law and the Code of the Village of Potsdam, that speed zones under New York law begin *at* the posted sign, not when a motorist can *observe* the sign. Moreover, assuming arguendo that Barber was not speeding, Thompson was still authorized to stop the vehicle based on the observations of Officer LaBrake who saw Barber make an illegal right turn at a traffic control device. As in *Scopo,* though this traffic violation and the others committed by Barber on the date in question were "minor," Thompson acted within his authority in stopping the white minivan. *Scopo,* 19 F. 3d at

8

781, *see also* N.Y.VEH. & TRAF. LAW § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1077 (1988) (probable cause arises when the police reasonably believe that "an offense has been or is being committed."). In *Scopo*, the police observed the vehicle in which defendant was traveling change lanes without signaling as required by the New York Vehicle and Traffic Law. 19 F. 3d at 780. Yet, federal task force officers chose to wait until the vehicle was stopped at an intersection 2.2 miles past the site of the traffic infraction to arrest him. *See id.* As a further matter, the organized crime agents who stopped defendant did not conduct traffic arrests as part of their usual duties. *See id.* None of these factors "negate[d] the fact that [the officers] directly observed Scopo violating the traffic laws and thus had probable cause to arrest him." *Id.*

It follows that, once Thompson had probable cause to stop the vehicle based on Barber's violation of the traffic law, police were entitled to search the vehicle, especially since there were inconsistencies in the stories offered by the three occupants of the vehicle and Thompson's K9 unit alerted to odor of narcotics in the vehicle. *See New York v. Belton*, 453 U.S. 454, 460 (1981) ("when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile") (footnotes omitted).[2]

---

[2] Thompson did not need probable cause to conduct the K9 "sniff search" of the vehicle's perimeter since it is well-settled that "canine sniffing is neither a serach or a seizure for purposes of the Fourth Amendment." United States v. Waltzer, 682 F. 2d 370, 373 (2d Cir. 1982).

## IV. CONCLUSION

Based on the foregoing, defendant Shefler's motion for suppression of evidence (Dkt. No. 51) is hereby DENIED in its entirety.

IT IS SO ORDERED.

Date:  January 13, 2009

_____
Norman A. Mordue
Chief United States District Court Judge